### IN RE: PALMAZ SCIENTIFIC INC.[1], Debtor.

### CASE NO. 16-50552-CAG

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Signed September 8, 2016

Filed 09/09/2016

---

1. The following cases are jointly administered with Palmaz Scientific Inc. under Case No. 16-50552-CAG: Advanced Bio Prosthetic Surfaces, Ltd. (Case No. 16-50555-CAG); ABPS Management, LLC (Case No. 16-50556); and ABPS Venture One, Ltd. (Case No. 16-50554).

Michael M. Parker, Steve A. Peirce, Norton Rose Fulbright US LLP, William B. Kingman, San Antonio, TX, for Debtor.

**MEMORANDUM OPINION AND ORDER GRANTING, IN PART AND DENYING, IN PART FIRST AND FINAL APPLICATION FOR PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES BY NORTON ROSE FULBRIGHT US LLP, ATTORNEYS FOR DEBTORS IN POSSESSION (TIME PERIOD: MARCH 4, 2016—JUNE 10, 2016) (ECF NO. 290)**

CRAIG A. GARGOTTA, UNITED STATES BANKRUPTCY JUDGE

Came on to be considered the First and Final Application of Norton Rose Fulbright US LLP for Reimbursement of Ex-

penses as Attorneys for Debtors in Possession from March 4, 2016—June 10, 2016 (ECF No. 290) (hereinafter "the Application). For the reasons stated herein, the Court finds that the Application is allowed, in part, and denied, in part.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334. This matter is defined as a core proceeding under 28 U.S.C. § 157(b)(2)(A) (administration of the estate) and 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a contested matter under Fed. R. Bankr. P. 7052, in which the Court may make findings of fact and conclusions of law. This matter is referred to the Court under the District Court's Order of Reference.

## BACKGROUND

Norton Rose Fulbright US LLP (hereinafter "Applicant") seeks from the bankruptcy estate, payable as an administrative expense, professional fees of $393,981.00 and reimbursement of expenses of $7,690.94 for a total award of $401,671.94 for the time period March 4, 2016 through June 10, 2016 for representation of debtors-in-possession Palmaz Scientific Inc. ("Palmaz Scientific"), Advanced Bio Prosthetic Surfaces, Ltd. ("ABPS"), ABPS Venture One, Ltd. ("Venture"), and ABPS Management, L.L.C. ("Management") (collectively, "Debtors").

Prior to filing of the jointly administered chapter 11 petitions, Palmaz Scientific was a Delaware corporation formed on February 12, 2008, and was owned by over 300 shareholders. Palmaz Scientific had three affiliate companies: ABPS, Venture, and Management. Palmaz Scientific was the 100% member owner of ABPS Management. ABPS Management served as the General Partner and one percent limited partner in ABPS. Palmaz Scientific owned the remaining 99% limited partnership interest in ABPS. Palmaz Scientific owned an 80% member interest in Venture. The other 20% of Venture was owned by Dr. Steve Bailey.

Debtors were involved in research and development dedicated to the advancement of the technology and science of medical implants. Debtors' headquarters were in San Antonio, Texas. The research and development operations were in Fremont, California. Together, Debtors owned 256 issued United States and international patents and 182 active United States and international patent pending filings on its technologies, including thin-film technologies and physical vapor deposition process innovations to produce more reliable implantable prosthetic devices. Debtors, however, had not yet created a medical device for mass production. Debtors' extensive intellectual property portfolio was the foundation for a technology platform with many potential implantable medical devices, including stents that address coronary, peripheral and intracranial indications as well as implantable devices in orthopedic and cosmetic prosthetic specialties. Debtors also owned highly specialized equipment.

Debtors' operations had been financed by a series of equity financings, raising capital by selling nearly $50,000,000 in equity interests to fund its operations. When they did experience revenue, Debtors' sources of revenue were related to joint development agreements or other partnering agreements. Debtors' are or have been a party to several lawsuits, which are described below:

(1) *Harriman v. Palmaz Scientific, Inc., et al.* 134th Judicial District, Dallas County, Texas, Cause No. DC-15-12314. Plaintiff Susan E. Harriman sued defendants Palmaz Scientific, Julio Cesar Pal-

maz, Steven Brett Solomon, Gary Zimpelman, John Asel, John Does 1-20 and Jane Does 1-20. Defendants Palmaz Scientific, Julio Cesar Palmaz, Steven Brett Solomon filed counterclaims against Susan E. Harriman Defendant (as Third Party Plaintiff). Palmaz Scientific filed third-party claims against Alan Chesler, Ehrenberg Chesler Interests, LLC, Ehrenberg Chesler Securities, Inc., and IMS Securities, Inc.

(2) *Ehrenberg, et al. v. Palmaz Scientific, Inc., et al.* 162nd Judicial District, Dallas County, Texas, Cause No. DC-15-11994. Plaintiffs Mildred V. Ehrenberg, Richard Benedikt, M.D., Arie Salzman, M.D., and Plant Family Investments Ltd. sued defendants Palmaz Scientific, Steven B. Solomon and Julio Palmaz, M.D.

(3) *Advanced Bio Prosthetics Surfaces Ltd.; et al. v Akin Gump Strauss Hauer & Feld, Baker Botts, L.L.P., and Cecil Schenker.* 225th District Court, Bexar County Texas, Cause No. 2014-CI-16776. Plaintiffs ABPS, Venture, ABPS Management, Palmaz Scientific, and Dr. Julio Palmaz sued Akin Gump Strauss Hauer & Feld, L.L.P., Baker Botts, L.L.P., and Cecil Schenker for breach of fiduciary duty, fraud, and conspiracy.

In November 2015, Palmaz Scientific issued a Confidential Private Placement Memorandum in an effort to raise additional operational and research funds, but such fundraising did not raise sufficient funds. Palmaz Scientific alleged that its fundraising ability and business operations were disrupted by litigation brought against Palmaz Scientific in Dallas, Texas. Palmaz Scientific brought counterclaims in that litigation asserting that the plaintiffs spread false and disparaging infor-

mation about Palmaz Scientific. Additionally, the counterclaims assert that false information was intentionally disseminated to current investors, potential business partners, the press, and even federal government authorities—resulting in substantial damages—essentially crippling Palmaz Scientific's ability to maintain its ongoing operations. In its counterclaims, Palmaz Scientific asserts the defamation irreparably harmed it and caused it millions of dollars in damages.

In light of its inability to raise additional capital, and the additional burden of pending litigation, Debtors concluded that they should sell all or substantially all of their assets in connection with a case under chapter 11.[2] Effective January 25, 2016, debtors retained Applicant to represent it in connection with the filing and prosecution of a chapter 11 bankruptcy case.

On March 4, 2016 ("Petition Date"), Debtors filed voluntary petitions commencing the above-captioned voluntary chapter 11 cases. Since the Petition Date, Debtors premised their chapter 11 cases on selling all of Debtors' assets. In connection therewith, Debtors employed—with Court approval—Gerbsman Partners to assist in marketing the assets to third parties. In addition, Debtors negotiated an agreement for Vactronix Scientific Inc. ("Vactronix"), a creditor of Palmaz Scientific and owned directly or indirectly by an insider of Debtors, to act as a "stalking horse" bidder for the assets. Through the marketing and auction process, third party bidders were given the opportunity to bid greater than Vactronix's $22,600,000.00 stalking horse bid (which was in the form of cash and a credit bid). At the auction of Debtors' assets and the final hearing on approval of the sale on June 10, 2016, the Court ap-

---

**2.** The testimony adduced at the hearing indicated that it was necessary for all four Debtors to file chapter 11 petitions in order for Vactronix, Inc. to provide debtor-in-possession financing.

proved the sale to Vactronix as the only bidder for all of Debtors' assets. As a result, the proceeds of the sale will be distributed to the creditors pursuant to the terms of the confirmed Second Amended Plan of Reorganization. In order for Debtors to meet their obligations through June 15, 2016, Vactronix provided a total of $1,600,000 in post-bankruptcy financing to Debtors. Such $1,600,000 in post-petition financing was part of Vactronix's stalking horse bid described above.

Applicant served as debtor-in-possession counsel beginning on the March 4, 2016, petition date. Two lawyers from NRF represented Debtors—Michael Parker and Steve Peirce. Both are accomplished professionals who have an excellent reputation with the Bar and the Court.[3] In addition, Debtors retained the law firm of Kreager Mitchell to represent them as corporate and transactional counsel. Debtors retained the law firm of Andy Taylor & Associates to represent them as litigation counsel in connection with the above-described litigation and also in connection with matters involving the State of Texas Emerging Technology Fund. Debtors retained the law firm of Rosenbaum IP in connection with the preservation and prosecution of Debtors' intellectual property portfolio. Debtors retained the law firm of Haynes and Boone to represent them in connection with Securities and Exchange Commission matters. Applicant states that employment of Kreager Mitchell and the Taylor Firm was at the request of Debtors, because their attorneys generally charge less per hour than attorneys with similar experience at large firms like Applicant's. Applicant asserts that it was necessary to employ Rosenbaum IP because

of its unique knowledge and experience with Debtors' intellectual property portfolio. Further, Applicant asserts that it was necessary to employ Haynes and Boone because of its ongoing experience with Debtors' Securities and Exchange Commission matters. Accordingly, Applicant maintains that, while there were extra fees and expenses to draft employment applications for, and coordinate with, many different law firms, such extra fees and expenses are much less than if Applicant's firm were required to handle all these matters alone.

Finally, Debtors retained the accounting firm of Groff & Rothe to assist them in their accounting, financial management and reporting functions and retained Up-Shot Services LLC as their noticing agent. Debtors retained investment banker Gerbsman Partners to assist Debtors in marketing their assets.

NRF's services to Debtors before withdrawing included: (1) filing the chapter 11 petitions; (2) preparing first day motions that included debtor-in-possession ("DIP") interim financing which was subsequently approved through four interim orders; (3) negotiation with Palmaz Scientific's Fremont landlord where its equipment was housed amid potential stay violations after the landlord locked Palmaz Scientific out upon lease expiration; (4) drafting and appearing on eight employment applications; (4) preparation of the Debtors' Schedules and Statement of Financial Affairs ("SOFA"); (5) appearing at the Debtors' meeting of creditors; and (6) negotiations and discovery with the unsecured creditor's committee and equity holders on budget and DIP financing issues.

---

**3.** The Court recognizes that other lawyers from NRF worked on the case; however, those lawyers did not appear in Court. Parker's rate as a partner is $675.00/hour and Peirce's rate as senior counsel is $575.00/ hour. Of the time charged to Debtors in this case, Parker and Peirce charged 547.2 of the total of 656.6 hours charged (ECF No. 290, NRF-2).

On May 5, 2016, this Court ordered the withdrawal of Applicant as debtor-in-possession counsel and the substitution of the Law Offices of William B. Kingman ("Kingman Firm") as debtor-in-possession counsel effective April 18, 2016. The Court authorized Applicant to assist the Kingman Firm in transition of the representation and to request payment of fees and expenses for such assistance. The Withdrawal Order was "without prejudice to Norton Rose Fulbright US LLP seeking payment of its fees and expenses as an administrative expense in this case as may be allowed by further court order, including payment of fees and expenses for assistance in transitioning the representation to replacement counsel." Applicant attached as Exhibit 7 to its Application, an outline and timeline of Applicant's general activities during the referenced period of service.

The summary of NRF's total requested fees is as follows:

| TIMEKEEPER NAME | HOURS | RATE | FEE |
|---|---|---|---|
| Michael M. Parker, Partner | 364.8 | $675 | $246,240.00 |
| Steve A. Peirce, Senior Counsel | 182.4 | $575 | $104,592.50 |
| Ronald J. Scharnberg, Partner | 5.0 | $565 | $2,825.00 |
| Timothy S. Springer, Associate | 20.5 | $385 | $7,892.50 |
| Gergory M. Wilkes, Senior | 26.3 | $640 | $16,832.00 |
| Elizabeth Boydston, Senior | 17.0 | $525 | $8,925.00 |
| Matthew Y. DeArman, Senior | 19.1 | $615 | $11,746.50 |
| John P. Jennings, Partner | 1.6 | $585 | $936.00 |
| Stephen P. Pate, Partner | 5.8 | $655 | $3,799.00 |
| Rebecca J. Winthrop, Counsel | 14.1 | $550 | $7,755.00 |
| | | | $411,543.50 |
| Less write off for Fee Application | | | $17,562.50 |
| TOTAL | 656.6 | $600 | $393,981.00 |

## OBJECTIONS TO NRF FEE APPLICATION

At the hearing on NRF"s Application, all objecting parties agreed that there were no challenges to the competency of NRF or the hourly rates of Parker and Peirce. Three parties in interest objected to NRF's fee application: the Debtors[4], the United States Trustee, and Vactronix.

### A. Vactronix Objections

Vactronix's Objection was twofold (ECF No. 335). Vactronix objected to a number of time entries, alleging that the time entries were inaccurate, not compensable, or should have been billed at a reduced rate, by using paralegals or associates to do the tasks. The other objections are to specific categories of fees (such as "Employment Applications" or "Real Estate") in which Vactronix argues that the fees should be disallowed because the fees are exorbitant or that NRF failed to provide compensable services. In summary form, the categorical objections are:

(1) In general, Vactronix argues that the time billed to "Employment Applications" is excessive. While a number of professionals were employed, the total amount billed for this category is over $35,000. Given that only one employment application received any meaningful objection, Vactronix

---

4. The Debtors did not file a separate objection to the fee application, but rather filed a joinder in support of Vactronix's Objection (ECF No. 364).

asks why it was necessary for two senior attorneys to provide services in this category at their high rates. Vactronix reasons that such services were neither reasonable nor necessary.

(2) Vactronix objects to all the fees in "Fee Applications" category. Vactronix notes that Parker billed a total of 12.5 hours to "categorize and normalize time entries into a spreadsheet" for a total of $8;437.50. Vactronix asserts that NRF's time entries should be contemporaneously recoded and should be kept pursuant to the U.S. Trustee guidelines. Further, Vactronix states that any attempt to "categorize" and/or "normalize" is an administrative function and is non-billable. Also, tasks such as spreadsheet manipulation should—at best—be billed by a paraprofessional.

NRF billed a total of 71.5 hours for a total of $47,562.50 in this category; however, NRF "capped" its fees in this category at $30,000. Of note, Parker and Peirce, both of whom are attorneys with over 20 years of experience, were the only two persons to bill time in this category. Parker billed 45.4 hours for a total of $30,645 for which · the time entry narrative only reads "Research and prepare fee application." Vactronix maintains that, even taking into account the proposed "cap," hours of time spent under the entry "research and prepare fee application," the fees are neither reasonable and/or necessary, and the time spent in this category as presented in the Application should be disallowed. Vactronix argues that this category of time also shows improper leveraging of the case on the part of NRF and that Debtors' estates should not bear the cost of only senior attorneys working on a fee application.

(3) Vactronix notes that most, if not all, of the time spent preparing schedules and the statements of financial affairs was done by Parker and Peirce. As such, Vac-

tronix posits that there is no justification as to why two senior attorneys spent hours and hours preparing schedules and statements, especially given that—despite repeated requests after the schedules were filed—the schedules were not amended to reflect the proper ownership of assets, the intellectual property, and the scheduling of claims. Vactronix argues that the same is true for the preparation and filing of the Monthly Operating Reports and that there is no basis or justification for senior attorneys to be spending hours working on Monthly Operating Reports.

(4) Vactronix objects to all the fees in the "Real Estate" category. Most of the time billed in this category relates to issues regarding the Palmaz Scientific's lease of space for its equipment and employees in California.

Vactronix argues that Parker knew at the time of filing of the petition that the lease would soon expire and that the space was critical to Debtors' marketing efforts. Vactronix complains that NRF's efforts related to the Real Estate category resulted in Debtors being forced to "cram" its equipment into a substandard space on a month-to-month basis without notice or opportunity to secure suitable space. Vactronix asserts that Parker allowed the landowner to use self-help and lock Debtors out of their space in violation of the automatic stay while maintaining possession and control of their equipment. Vactronix complains that, instead of immediately acting to bring claims for violation of the stay and damages, Parker began long distance negotiations that resulted in: (i) no claims being made against the landlord, (ii) a hurried forced move that cost Debtors thousands of dollars, and (iii) inadequate and expensive space not suitable for maintenance and/or use of Debtors' equipment. Therefore, Vactronix asks that all time in this category be denied.

(5) As an overall objection to the allowance of NRF's fees, Vactronix argues that, from the outset, Vactronix announced its intention to make a debtor-in-possession ("DIP") loan that would allow for a quick sales process whereby—at worst—Vactronix would either pay or assume all allowed unsecured claims. Vactronix also offered to fund the remaining litigation to allow a return for equity holders. Nonetheless, equity holders objected. Additionally, an Unsecured Creditor's Committee of two unsecured creditors was appointed by the United States Trustee and the committee objected. Thereafter, Vactronix alleges that NRF insisted that the only way the case could go forward was if Vactronix agreed to increase its DIP loan because $1,600,000 was not going to be enough to pay NRF's fees.

As a result, Vactronix states that NRF demanded more fees while Vactronix arranged to meet with the equity holders to resolve their objections. When presented with the results of those meetings, Vactronix maintains that NRF insisted that Debtors could not go forward without additional funds to pay NRF. Moreover, the initial budget that NRF estimated showed that the vast amount of the original $1,600,000 that was requested was needed to pay fees of NRF. Both NRF's pre- and post-petition budgets were exceeded.

Therefore, Vactronix argues that the Court needs to measure what Debtors accomplished/gained as a result of all of NRF's efforts. Other than insisting that Debtors receive more money, NRF played no role until the end in the Term Sheet which became the basis for resolving this case and constituted part of Debtors' plan of reorganization. Further, Vactronix states that those matters that NRF did put forward or addressed were either left unresolved (i.e. DIP loan and stay litigation) or bad or poor results followed (i.e. lease termination).

## B. United States Trustee Objections

The United States Trustee also objected to NRF's Application (ECF No. 342). In its Objection, the United States Trustee objects to the allowance of NRF's fees on a categorical basis. In summary, the United States Trustee argues that:

(1) While Applicant explains that it sought the employment of multiple professionals for the Debtors, the explanations do not support a finding that more than $36,000 is a reasonable amount of fees for preparation and representation for "Employment Applications." For example, Applicant states that it needed to file motions to expedite hearings on each application. Local Rule 2014(d) provides that the Court may grant applications without a hearing and that any party that objects then has twenty-one days to file an objection. Thus, the employment applications could have been filed without motions to expedite and hearings were unnecessary on uncontested applications. Therefore, the United States Trustee argues that time related to the motions to expedite and hearings on uncontested applications was unnecessary and should not be allowed.

Moreover, the United States Trustee argues that the fees incurred for employment applications are understated. The United States Trustee notes that NRF uses several other category headers that could be classified as "catch-all" provisions and which have some entries that belong in a more specific category. For example in the "Pleadings" category, NRF includes entries on March 22 for $945 related to the fee procedure motion and on April 18 and April 20 that relate solely to the Gerbsman application totaling $1,012.50 (ECF No. 290, NRF-5 at 82, 84). Thus, the United States Trustee argues that the total for the employment application category exceeds $38,000.

The United States Trustee disputes the Applicant's statement that "U.S. Trustee objections to professional employment applications made budget negotiations even more difficult." The United States Trustee notes, however, that it filed only one objection to an employment application—the application to employ Gerbsman Partners, the business broker. Further, the United States Trustee negotiated a resolution with Mr. Gerbsman and argues that application had no bearing on the DIP financing because the retainer had already been paid and the success fee for Gerbsman Partners was always intended to come from the sales proceeds, not the DIP financing. Thus, the United States Trustee argues that any objection to the professional employment applications should not have made budget negotiations more difficult.

(2) The United States Trustee argues that the fees for the "DIP Financing" and "Discovery and related Litigation" categories are excessive. The United States Trustee observes that on the first day of the case, Debtors sought to enter into DIP financing with Vactronix. Debtors sought approval to borrow $1.6 million on an interim basis and $2 million on a final basis. Notably, Palmaz Scientific was no longer operating. It had a skeletal staff of eight employees but was not producing any revenue. Of the $1,527,879 Debtors expected to spend in the first thirteen weeks, $525,250 was earmarked for Applicant—approximately one-third of the budget.

In addition, while some investors sought discovery on issues regarding the DIP financing motion, the discovery does not justify why the cost of preparation, negotiating, and prosecuting the DIP financing motion exceeded $150,000 during the two months NRF represented the Debtor. The DIP financing motion was filed on the first day of the case. Thus, the United States Trustee surmises that Applicant likely received additional payment before the case

was filed for the initial negotiation for the DIP financing and its preparation of the motion and proposed order. In addition, NRF billed time in other categories for the DIP financing. For example, Applicant billed $6,875 for two attorneys to attend the hearings on DIP financing on May 5 but put that time in "Trial and Hearing Attendance" (ECF 290, NRF-5 at 101).

(3) The United States Trustee also objects to NRF's assertion that it spent significant time preparing Debtors' budget. Because Debtors were not operating, the United States Trustee questions why budget preparation took as much time as it did. The budget attached to the final DIP financing order has twelve categories, five of which are professionals including Mr. Ed Sprague's (the Debtors' corporate representative in the cases) monthly fee (ECF No. 338). The fourteen week budget attached to the final DIP order is about $60,000 different than the original budget attached to the motion to approve DIP financing filed on the first day of the case (ECF Nos. 15 and 338). While the amounts in most categories did change, the United States Trustee believes it is questionable why all the time billed for this project was reasonable and necessary.

(4) The United States Trustee notes that Applicant stated that it spent $47,562.50 in time "categorizing, reviewing and preparing this application." Applicant has agreed to cap its fees in this category at $30,000. The United States Trustee argues that 3 to 5 percent of the total fees is generally considered a reasonable fee to prepare a fee application. *In re Mesa Air Group,* 449 B.R. 441, 445 (Bankr.S.D.N.Y.2011). On this fee application, those fees would calculate to about $12,000 to $20,000. The United States Trustee argues that the Court should reduce the fees requested to an amount within that range.

(5) Finally, the United States Trustee asks the Court to consider that Applicant seeks in excess of $400,000 for two months' representation of non-operating chapter 11 debtors, during which time it did not prepare a plan of reorganization or disclosure statement. Consequently, on just the amount of the fees sought, the United States Trustee argues that the fees are far in excess of services provided to Debtors.

## C. NRF Responses to the Vactronix and United States Trustee Objections

NRF filed two Responses to the Objections to Fee Applications. In its Response to the Vactronix Objection (ECF No. 353), NRF argues that:

(1) NRF, at the direction of Debtors, used the Fremont landlord's compromised position—the purported violation of the automatic stay—to negotiate a new, better deal on alternative space. That new lease deal was brought before the Court for approval and Vactronix did not oppose the bankruptcy court's approval of that deal. Therefore, Vactronix should be collaterally estopped from attempting to attack that deal at this stage.

(2) NRF maintains that Debtors had to delay bid procedures and an asset sales pending a stalking horse offer, which was expected from Vactronix. Moreover, shareholder opposition and discovery also hindered Debtors' and NRF's ability to move quickly to a sale of assets, extending the amount of time the Fremont facility was needed, notwithstanding lease expiration on March 31, 2016. When the landlord unexpectedly, and in violation of the stay, broke into the Fremont facility and chained the doors shut, NRF and Debtors responded swiftly and appropriately. The landlord claimed that 11 U.S.C. § 362(b)(10) provided a stay exception to its actions. NRF advised that the landlord's exercise of dominion and control over Debtors' equipment in the Fremont facility was not shielded by 11 U.S.C. § 362(b)(10).

(3) In Vactronix's Objection ¶¶12, 14, 15, 19, 25, 27, Vactronix complains about the following: (i) (Case Administration) a 3/7 Peirce entry for checking the docket and sending document to upshot (.6); (ii) (Document Production) a 3/23 Peirce entry regarding filing a document (.1) and 4/8 and 4/19 Peirce entries regarding bates labeling documents (.3 + .7); (iii) (Employment Applications) 2/23 and 4/4 Peirce entries regarding uploading orders (.2) and filing a certificate of service and (.1); (iv) (Financing) 4/14 Parker entry without narrative (1.1); and (v) (Other Contested Matters) regarding 3/15 Peirce entries regarding sending an order to Upshot (.2) and uploading an orders (.1). In their Response, NRF agreed to withdraw its request for compensation as to these entries, which total $2,065.00.

(4) Vactronix complains that NRF did not use a lower billing rate attorney or paralegal for certain tasks. NRF agrees that NRF did not bill the estate for a bankruptcy paralegal, but NRF did effectively use one, particularly for the preparation of Schedules and SOFA, whose services were and continue to be helpful to the estates. NRF does not bill for her time, but she performs nearly all the tasks that a paralegal would otherwise perform, without charge.

(6) NRF states that as to the issue of the overall amount of NRF's fees, Debtors' and NRF's original budget contained three key assumptions:

a. No Creditors Committee would be appointed and no money was allocated in the budget for same;

b. There would be no disputes with shareholders or others because creditors were to be paid in full;

c. Debtors would provide a financial officer to replace John Asel, who would depart pre-petition.

NRF argues that all of these budget assumptions were violated.

A Creditors Committee was appointed and demanded the budget accommodate their fee requests, which were refused by Vactronix. Two of the largest non-insider shareholders showed up at the first day hearings objecting to the DIP financing, and immediately sought extensive discovery of Debtors. Debtors never provided a replacement for John Asel. In fact, Asel became the sole management representative for Vactronix. Debtors' failure to retain a CRO or a new CFO placed additional burdens on NRF and triggered many of the complaints lodged by shareholders early in the case. This also took Debtors and NRF down a path of discovery and dispute that was costly for the bankruptcy estates.

(7) NRF notes that during March and April—while NRF was Debtors' counsel—shareholder objections prevented final DIP approval. NRF was required to prepare for and attend four separate interim DIP hearings, escalating NRF's costs.

(8) NRF argues that Vactronix's failure to deliver a promised "offer" to purchase Debtors' assets at or near the petition date made Vactronix responsible for many of the additional costs incurred by NRF. In fact, Vactronix did not actually deliver the promised offer until early April, a month after Debtors filed their petitions. This delay left NRF to deal with Debtors' creditors, landlord, shareholders, and contract counterparties with only a speculative exit plan to convince these constituencies of Debtors' *bona fides*. This late offer to purchase also (i) delayed substantially the sale process as Debtors were reluctant to pursue a naked sale of their assets, and (ii) increased Debtors' costs while decreasing Debtors' leverage (*see e.g.* description of

Debtors' negotiations on an expired lease with landlord).

In its Response to the United States Trustee's Objection (ECF No. 359), NRF argues that:

(1) The United States Trustee alleges the process of employing all the professionals which Debtor decided were necessary to the case was too expensive, or at least that Applicant spent too much time accomplishing that task. The United States Trustee states that Applicant's explanations of its need to employ multiple professionals "do not support a finding that more than $36,000 is a reasonable amounts for these services." NRF states that while it does add extra cost to draft employment applications for numerous professionals, the cost was necessary and reasonable. Moreover, NRF is not an accounting firm so that Groff & Rothe's hiring was necessary. NRF is not an investment banker so that the hiring of Gerbsman Partners was necessary. Given the number of parties in interest in the case, it was much more efficient to hire UpShot Services, LLC as noticing agent rather than have NRF do the noticing. NRF believed that the hiring of small law firms Andy Taylor & Associates and the Kreager Firm allowed Debtors to hire experienced counsel with expertise in discrete issues at lower rates than similarly experienced NRF lawyers. NRF argues that the hiring of Rosenbaum IP and Haynes and Boone was necessary and reasonable because of their pre-petition knowledge and experience in representing Debtors, and to have NRF lawyers do this work would have been much more expensive given the learning curve. In short, NRF argues that the cost of the multiple employment applications more than paid for itself.

(2) NRF recognizes that Local Rule 2014(d) is an option available to debtors, but maintains that Rule 2014(d) is not an

option that always suits a debtor's needs. Applicant prepared employment applications for seven professionals (Norton Rose Fulbright, LLP; Groff & Rothe; Upshot Services, LLC; Gerbsman Partners; Rosenbaum IP; Haynes and Boone, LLP; and Andy Taylor & Associates). With the possible exception of Haynes and Boone, LLP, all of these professionals were providing services to Debtors immediately on the Petition Date. As such, Debtors wanted to provide each of the professionals in the case the comfort of a bankruptcy court order approving (or denying) their employment at the earliest possible date. NRF asserts that Local Rule 2014(d) does not provide that comfort. This case was designated as a complex case. Further, NRF states that it is not unusual, especially in a complex chapter 11 case, to seek approval of employment of professionals as a first-day matter.

(3) The United States Trustee complains that $150,000 is too much to have spent on negotiating a $1.6 million loan. NRF argues that, while it is true that every loan is different and that generally larger loans require more effort and diligence to negotiate, every DIP loan requires a minimum level of due diligence and negotiation that is necessary to properly document and approve such loan. Also, NRF spent a significant amount of time negotiating a security agreement, a credit facility, and a proposed DIP order.

(4) The United States Trustee argues the cap that Applicant applied to its Fee Application preparations was too high and that a 3-5% cap would be reasonable. Applicant believes its 7.5% cap is reasonable and is acceptable under the circumstances of this case. *See In re Chicago Lutheran Hosp. Assoc.*, 89 B.R. 719, 743 (Bankr. N.D.Ill.1988) (Court allowed counsel to charge 7.5% of total fee application for fee application preparation and prosecution.).

NRF asks the Court to consider that Debtors' Plan was confirmed at 100% rate of distribution to all creditors, with a litigation trust that provided for recovery from any of the Debtors' lawsuits or counterclaims to be placed in the trust for the benefit of equity holders. NRF argues that from a "results obtained" perspective, the Plan as confirmed comported with what NRF proposed Debtors do at the time of filing of the petitions.

## EVIDENCE AT HEARING ON NRF FEE APPLICATION

The Court heard testimony from three witnesses; Michael Parker on behalf of the Applicant; Dr. Ed Sprague on behalf of Debtors; and John Asel on behalf of Vactronix. All three witnesses were credible. Also, because much of what was argued or testified to at the hearing was previously incorporated into the parties' objections to the Application and NRF's responses, the Court will summarize the testimony of all three witnesses.

### A. Michael Parker

Parker's testimony tracked much of what NRF alleged in its Fee Application and Responses to Vactronix's and the United States Trustee's Objections. Parker stated that it took a significant amount of time to get the cases filed because no DIP financing was in place. He testified that the problems with the Fremont landlord were not anticipated in that the he did not expect the landlord to lock out Palmaz Scientific. The problems with the landlord exacerbated Debtors' ability to go forward in the case because of a lack of leased space for its specialized equipment.

As stated in NRF's Responses, Parker maintained that in case of this size with no ongoing operations, he did not anticipate that a creditor's committee would be formed nor did he expect much resistance

from equity holders. He also testified that he expected that John Asel would be available more often to assist with the financial aspects of Debtors, including budgeting. While Parker appreciated the assistance of Dr. Sprague, Parker testified that with Sprague's medical background and only eight other key employees remaining after the petitions were filed, the ability to generate financial documents and respond to equity holder discovery requests was compromised.

Parker pointed out that the NRF retention letter of February 1, 2016, (NRF Ex. 8), specifically addressed the inherent costs of bankruptcy and put Debtors on notice that the case would be expensive because the Court would not approve a chapter 11 plan that did not pay all creditors in full—particularly if an insider, such as Vactronix, would be the stalking horse bidder. Further, while Parker sought to have a bankruptcy associate work on the case to keep costs down, the associate became unavailable; Parker explained that, under time constraints of the case (confirmation in less than two months), it was counterproductive to bring in another associate, given that there was a dearth of bankruptcy associates available.

When cross-examined by the United States Trustee, Parker acknowledged that NRF was seeking fees in the approximate sum of $400,000 for roughly eight weeks of work and that based on his and Peirce's hourly rates, it would amount to approximately working on the case eight hours a day. Parker testified that the amount of work NRF was required to put into the case was a function of Dr. Sprague's non-financial background and the fact that there were only three of Debtors' employees to assist NRF in all aspects of the case. Parker further stated that, notwithstanding all of the other counsel involved, NRF had difficulty in accomplishing some of its objectives due to lack of Debtor support. Parker acknowledged that the fees for DIP financing were high but contended that, with the involvement of the creditor's committee and equity holders plus Vactronix's intransigence to pay for committee counsel, NRF's ability to negotiate a DIP financing order was complicated by the number of parties involved. Parker emphasized that a great deal of time was spent initially to secure DIP financing and a purchaser; otherwise, the case would fail. Parker also did recognize that using employment application templates could have reduced the cost of preparing multiple employment applications.

When examined by Vactronix's counsel, Parker admitted that NRF was paid $150,000 for four interim DIP orders and that $50,000 of that amount included depositions and discovery. Further, Parker agreed that the original amount for the DIP financing was $1,600,000 and that NRF's request for an increase to the DIP loan was largely due to an increase in administrative fees, mostly for NRF. Parker reiterated his position that the delay in getting a DIP loan for Debtors was attributable to Vactronix, not Debtors. Parker maintained that, in his judgment, there was insufficient time to get associates working on the case and that NRF did not have any bankruptcy associates to work on the case. Moreover, Parker emphasized that he and Peirce employed billing discretion and avoided duplicating efforts and time in court. Parker acknowledged that NRF's fees for services did not include any significant discovery disputes, completion of the DIP loan and related sale, disclosure statement and plan of reorganization preparation, or drafting and negotiation of the term sheet.

### B. Dr. Ed Sprague

Dr. Sprague serves as the sole director of Palmaz Scientific and is its authorized

representative. Notwithstanding Parker's suggestion that Sprague lacks business acumen, Sprague testified that he has hired and fired employees in his capacity as a trustee for a school district and that he has overseen a $100 million budget for research. Sprague acted on behalf of Debtors from the date of petition and was present for all court hearings and participated in all of Debtors' negotiations. Sprague says that he told Parker on March 15, 2016, that the Fremont lease would expire and how critical it was to the sale process to have Debtors' equipment placed where it could be inspected for purchase. Sprague contends that Parker told him that, with the automatic stay in place, the landlord would not act against Palmaz Scientific. As a result, Sprague believes that NRF's failure to act prudently forced Debtors and the landlord into an adversarial position which compromised Debtors' reorganization.

Dr. Sprague also testified that, once the unsecured creditor's committee and equity holder counsel became involved in the case, NRF pushed for more fees and that, if Debtors would not consent, NRF wanted the case converted to chapter 7. Sprague also questioned why NRF had additional attorneys working on the DIP financing where there appeared to be a duplication of attorney time on the DIP interim orders. Sprague also stated that he thought the fees for preparation of the schedules was high, and that the overall fees in the case appeared to be inordinately high given the amount of representation provided in the case. Further, Sprague contends that he was never presented with interim fee bills which further upset him when he saw NRF's fee application. That said, Sprague acknowledged that he reviewed and signed off on all pleadings, including the budgets used in the case. Sprague also agreed that it was NRF who suggested

that, if Debtors were unhappy with the cost of NRF's representation, he could retain less expensive counsel in San Antonio.

## C. John Asel

John Asel previously worked for Palmaz Scientific as Chief Financial Officer before resigning his position pre-petition to work for Vactronix. He was involved in the DIP financing process and stated that he did provide assistance to NRF when it came to financial matters concerning Debtors. He, like Sprague, expressed concern over the amount of NRF's fees and the fact that less expensive associates were not involved in the case. Asel said that he was not even aware that associates that were to work on the case did not do so until the fee application was filed. He also agreed with Sprague's rendition of what precipitated the lock out by the Freemont landlord and how it adversely affected Debtors. Further, Asel corroborated Sprague's testimony that NRF became more concerned about its fees once the creditor's committee and equity holder counsel became involved.

Asel did agree with Parker, however, that there would be no money available to pay equity holders. Asel also agreed that the $1,600,000 budget did not change after creditor's committee and equity counsel attorneys became involved in the case. Asel also acknowledged that the Fremont landlord was never interested in extending the lease to accommodate Debtors' sale of its assets; thereby, putting Debtors' plan of reorganization in jeopardy.

## DISCUSSION

Pursuant to 11 U.S.C. § 330(a)(1)[5], a professional employed by a debtor-in-possession may be awarded: (a) reasonable compensation for actual and necessary ser-

5. Unless otherwise indicated, all references are to 11 U.S.C. *et seq.*

vices performed by the professional; and (b) reimbursement for actual, necessary expenses. The court may, on its own motion or the motion of the trustee, award compensation that is less than the amount of compensation that is requested. § 330(a)(2). The statute further precludes courts from awarding compensation for "unnecessary duplication of services; or services that were not reasonably likely to benefit the debtor's estate; or necessary to the administration of the case." § 330(a)(4)(A).

▓ In accordance with Fifth Circuit case law, bankruptcy courts employ the lodestar method to calculate reasonable fees under § 330(a). *Cahill, Walker & Patterson, P.C. (In re Cahill)*, 428 F.3d 536, 539–40 (5th Cir.2005). The lodestar is computed by multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate in the community. *Id.* at 540. The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case, looking specifically to the *Johnson* factors. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). The *Johnson* factors include the following: (1) time and labor required; (2) novelty and difficulty of the legal questions; (3) skill required to properly perform the legal services; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *In re MSB Energy, Inc.*, 450 B.R. 659, 662 n. 7 (Bankr.S.D.Tex.2011) (citing *Johnson*, 488 F.2d at 717–19).

In its en banc decision in *Barron & Newburger, P.C. v. Texas Skyline et al.*, 783 F.3d 266 (5th Cir.2015), the Fifth Circuit Court of Appeals analyzed the statutory framework of chapter 11 cases regarding the retention of professionals for the debtor. In doing so, the court recognized that a chapter 11 debtor may retain counsel and hire professionals for the estate. *Id.* at 271. The court observed that Congress enacted a uniform scheme for retaining and hiring professionals and attorneys under §§ 327-330. *Id.* at 271–72. Under § 330(a)(1), an attorney whose employment was approved under § 327 may request "reasonable compensation for actual, necessary services rendered." *Id.* Moreover, the bankruptcy court may use its discretion in awarding compensation less than the amount requested. *Id.* Section 330(a)(3) directs courts to "consider the nature, the extent, and the value of the legal services provided when determining the amount of the reasonable compensation to award, taking into consideration a number of factors listed in § 330(a)(3)." *Id.* Further, under § 330(a)(4), a court may not allow compensation for "services ... not reasonably likely to benefit the debtor's estate ...." § 330(a)(4)(A)(I).

The Fifth Circuit explained that § 330 "states twice, in both positive and negative terms, that professional services are compensable only if they are likely to benefit the debtor's estate or are necessary to case administration." *Id.* at 273. Stated differently, a court may approve compensation of an attorney for services that are "reasonably likely to benefit" the estate and determine the reasonableness "at the time in which the service was rendered." *Id.* The court also recognized that litigation is a gamble and that § 330 permits a court to compensate an attorney not only for services that were necessary, but also for good gambles for services that were objectively reasonable at the time they

were performed. *Id.* at 274. As such, the court concluded that the "actual benefit" test should be replaced by a prospective standard, following the holdings in the Second, Third, and Ninth Circuits.[6]

In reaching its decision, the Court notes that it has carefully reviewed the admitted evidence and weighed the credibility of each witness. The Court has also examined its docket in these cases and all relevant pleadings in connection with its consideration of the NRF Application. The Court can make several initial findings that apply to its consideration of NRF's Application. To begin with, notwithstanding the objecting parties' complaints about the amount of NRF's fees, no one complained about the experience, competency, and hourly rate of Parker and Peirce. As such, the Court shall not reduce NRF's fees on the basis of those factors. Second, the Court agrees with NRF that Vactronix—and Debtors' close association to Vactronix—stood to benefit financially from any reduction of NRF's fees. Third, the Court finds that Vactronix had the ability to dictate the terms of the DIP financing because without DIP financing, the cases would fail. Fourth, the Court agrees with the objecting parties that fees could have been reduced had associates been dedicated to the case. The blended rate of representation in this case was $600/hour. The Court finds that, in a firm of NRF's size, there should have been some associates that could have assisted in the case. Fifth, when examining the amount of fees requested versus the types of services provided, the Court notes NRF did not complete the case or provide the customary services of drafting an asset purchase agreement, disclosure statement, plan of reorganization, term sheet, and negotiating same with all the constituencies in the case. Also, when comparing Debtors in this case—non-operating entities with few employees and few assets other than patents—to the fees requested in other cases, NRF's fees could have been lower with the usage of more associates and a reduction of lawyers working on the DIP loan and other matters.

While the Court understands that it only sees a small component of what actually transpires in a case, the Court disagrees with NRF's assumption that there would not be any opposition, equity or not, in this case. In the Court's judgment, the fact that the purchaser of Debtors is a company controlled by the wife of Julio Palmaz, an insider, who would by purchase acquire back Debtors to the non-payment of $40 million in equity, should have prompted NRF to be more cautious in its expectations. The Court further finds that there is a mixed picture on what the agreed upon approach should have been in dealing with the Fremont landlord; but there is little doubt that its ultimate resolution affected the reorganization process.

The objecting parties couched their objections into four categories and made an overall objection to the amount of NRF's fees. Aside from these broad categorical objections, Vactronix also asks the Court to reduce NRF's fees on a line item basis, including what should be one-half time charges for time incurred in coming to Court. The Court finds the "one-half" time objection unavailing and denied. Further, no party in interest objected to allowance of NRF's request for reimbursement for

6. *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 71 (2d Cir.1996); *abrogated by Lamie v. U.S. Trustee*, 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (finding that a fee award should be contingent on reasonably likely to benefit the estate standard); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131–32 (3d Cir. 2000) (rejecting a standard under § 330 that required a hindsight evaluation); *In re Smith*, 317 F.3d 918, 926–27 (9th Cir.2002) (§ 330(a)(4)(A) requires a prospective approach in fee awards).

expenses in the amount of $7,690.94. Accordingly, those expenses are allowed.

## A. Employment Applications

■ Applicant sought $36,102.50 for employment applications. NRF maintained the eight employment applications required immediate attention and were not boiler plate pleadings. The Court disagrees. The Court has independently examined the employment applications in this case and can find nothing remarkable or difficult in their preparation. The employment applications are somewhat boilerplate, but for the employment applicant's statement of disinterestedness. As noted by the United States Trustee, the applications did not require expedited consideration under the Local Rules. Moreover, only one application drew an objection. NRF did not offer a credible explanation as to why so much time and effort were put into employment applications that, in the Court's judgment, are somewhat perfunctory. The Court finds the time expended and fees charged are not reasonable and necessary under § 330. Based on the Court's experience, the Court finds that NRF should only receive $10,000 in this category for preparation of the employment applications and attending hearings on the applications.

## B. Preparation of Schedules and SOFA

Applicant states in its Application that services for preparation of the Debtors Schedules and SOFA are contained under the headings "DIP Financing" (seeking $100,951.00) and "Other Written Motions and Submissions" (seeking $25,140.00). Applicant argues that, given Debtors' employees' lack of availability and the usage of NRF's paralegal (for which NRF did not bill Debtors) to draft the Schedules and SOFA, the fees in this category are reasonable. Vactronix complains of the "hours and hours" of time that Parker and Peirce spent on preparing the Schedules and

SOFA, but offers no methodology to reduce the fees in this category. The Court cannot discern any overbilling, and the objection to this category of fees is denied.

## C. Landlord Issues

Vactronix objected to the fees requested in the "Landlord Issues/Real Estate" category (seeking $30,151.00), arguing that NRF failed to resolve the landlord issue in a timely fashion to the detriment to Debtors. Further, when the chapter 11 petitions were filed, Vactronix argues that NRF knew that the lease would terminate on March 31, 2016. Parker countered by stating that he thought the automatic stay would protect Debtors, and that, given the almost immediate disposition of Debtors' assets through contemplated sale in the case, he did not need to address the landlord issues until it became critical. Parker also stated that he understood the necessity of protecting the Debtors' equipment and that he did act quickly in negotiating better terms for the lease after the lock out. That said, the Court finds credible the collective testimony of Sprague and Asel that NRF did not fully address Debtors' concerns about the landlord initially and that it was one of the reasons that Debtors' terminated NRF. Further, the Court finds that the fees in this category could have been reduced had NRF acted more quickly. While it is difficult to quantify how NRF's litigation approach affected the overall case, the Court does find that the fees in this category of roughly $30,000 are not reasonable given the importance of the lease termination to the reorganization process. As such, NRF's fees are reduced to $20,000 in this category.

## D. DIP Financing and Related Services

All three parties objected to Applicant's fees for DIP financing and related services that amounted to $150,000. The Court

notes that NRF negotiated four interim DIP orders. The Court has already indicated that the fact that there was an unsecured creditor's committee and·· equity holder counsel in the case does not necessarily implicate the allowance of fees sought in this category. Further, when weighing the testimony of Parker, Sprague, and Asel, it is clear that the fees in this category could have been reduced by using more associates to do the work and reducing the numbers of attorneys assigned to the DIP loan and related services. After reviewing the time records in this category for fees, it appears to the Court that, at times, there were multiple attorneys working on the same aspects of the DIP loan. That said, the Court also recognizes that Vactronix had leverage over Debtors by not originally agreeing to pay for unsecured creditor's committee counsel fees. Further, without DIP financing, the case could not go forward because Debtors did not generate revenue. Based on the Court's experience; the Court finds that the fees in this category, when measured against similar types of chapter 11 cases, should be less. The Court cannot understand why it took a team of attorneys to negotiate a $1.6 million DIP loan— even taking into account the opposition of the committee and equity holders. Further, given Debtors' non-operational status, the budget negotiation process should not have been complicated or prolonged. The fees for DIP loan, budgets, discovery thereto, and negotiation time to complete these tasks should have taken less attorney time or made better use of associate time. The Court finds that this category should be reduced to $115,000. A reduction of $35,000 in this category of fees recognizes some duplication of services by NRF and the need for better cost containment by employing less expensive attorneys for a somewhat straight forward process of executing loan documents.

### E. Preparation of Fee Application

Finally, the objecting parties assert that $30,000 to prepare a fee application is excessive even where the Applicant voluntarily reduces its fees in this category by $17,000.00. Both NRF and the United States Trustee suggest fees for preparing a fee application should be capped upon a percentage of the fees requested. The Court agrees that a percentage cap on fee preparation is warranted in this case. The fees requested in this case are roughly $393,000. The Court finds a fee cap of five percent of the fees sought is appropriate in this case for fee application preparation. As such, fees are allowed under the fee application category at five percent of $393,000, or $19,650.

After these noted reductions, the objecting parties ask that the Court to make a general finding that the fees as requested are excessive and make the appropriate reduction. Given the Court's stated reductions herein, the Court sees no reason to reduce NRF's fees further.

#### CONCLUSION

IT IS THEREFORE ORDERED that the First and Final Application of Norton Rose Fulbright US LLP for Reimbursement of Expenses as Attorneys for Debtors in Possession from March 4, 2016— June 10, 2016 (ECF No. 290) is GRANTED, IN PART and DENIED, IN PART.

IT IS FURTHER ORDERED that Norton Rose Fulbright US LLP is awarded fees in the amount of $310,312.50 as counsel for Debtors in Possession · from March 4, 2016 to June 10, 2016.

IT IS FURTHER ORDERED that Norton Rose Fulbright US LLP shall be reimbursed for its expenses of $7,690.94.

IT IS FURTHER ORDERED that the total amount of fees and reimbursement of expenses granted by this Court to Norton Rose Fulbright US LLP as counsel for

Debtors in Possession from March 4, 2016 to June 10, 2016, is $318,003.44.

All other relief not specifically granted herein is DENIED.